(Nos. 12373-12374.—Decrees affirmed.)

WILLIAM H. SMITH *et al.* Defendants in Error, *vs.* ANNA BELL LOVE, Plaintiff in Error.—WILLIAM H. SMITH *et al.* Defendants in Error, *vs.* MAUD HENSON *et al.* Plaintiffs in Error.

*Opinion filed February 20, 1919.*

1. EQUITY—*when objection that there is a remedy at law is waived.* Where the relief sought in a bill is not foreign to equity jurisdiction, an objection that there is a remedy at law must be made in the trial court, and on a bill to quiet title the defense that the complainant is out of possession and hence has a complete remedy at law comes too late when first set up in the Supreme Court.

2. SAME—*fact that same evidence is available in law will not prevent equity jurisdiction.* Where there are equitable grounds for relief, the fact that the same evidence may be available in an action at law will not prevent a court of equity taking jurisdiction.

3. DEEDS—*when weight will be given to finding of chancellor on question of mental capacity of grantor.* On a bill to set aside deeds, where there are a large number of witnesses on each side testifying to facts and giving opinions as to the grantor's mental capacity, much weight will be given, on appeal, to the finding of the chancellor who heard the evidence.

WRITS OF ERROR to the Circuit Court of White county; the Hon. CHARLES H. MILLER, Judge, presiding.

W. R. JONES, C. B. TEAGUE, and J. W. CRAWFORD, (W. P. SEEBER, of counsel,) for plaintiffs in error.

JOE A. PEARCE, and CREIGHTON & THOMAS, for defendants in error.

Mr. JUSTICE CARTWRIGHT delivered the opinion of the court:

Andrew J. Smith was the owner of 160 acres of land in White county, and on January 12, 1914, he executed a deed for 40 acres, on which his dwelling was located, to Clarence Stallings, his tenant, with whom he lived, and on January 31, 1914, he executed two deeds conveying the remainder of his lands,—one to Maud Henson of 40 acres and one to Anna Bell Love of 80 acres. He died on September 22, 1915, intestate, leaving no widow or child and leaving William H. Smith and Otilla Perkins, his brother and sister, his only heirs-at-law, who filed three separate bills of complaint in the circuit court of White county against the several grantees to set aside the deeds on account of alleged want of mental capacity of Andrew J. Smith to execute the same and fraud and undue influence by the grantees. The bills were answered with denials of any want of mental capacity of Smith or fraud or undue influence on the part of the grantees. It was stipulated that the suits should be heard together upon the same evidence and they were so heard by the chancellor. A decree was entered in each cause finding that Andrew J. Smith was mentally incapable of executing a valid deed and was easily influenced and persuaded to do anything that might be suggested to him by those around him, and that he was unable to understand and comprehend the nature of his acts or the effect of the deeds, and setting aside the deeds as clouds upon the title of the heirs-at-law. Anna Bell Love and Maud Henson sued out writs of error from this court to review the decrees setting aside the deeds to them, and the evidence and arguments being the same, the cases will be decided in one opinion.

It is assigned for error and contended in argument that the circuit court had no jurisdiction for want of allegation and proof that the premises were in the possession of the complainants or were unimproved or unoccupied. The question whether there was an adequate remedy at law was not raised by demurrer or otherwise in the circuit court and the relief sought was not foreign to equity jurisdiction. The general rule in such cases is that the objection that there was a remedy at law must be made in the trial court, and if not so made it is waived and cannot be made for the first time in this court. (*Phillips* v. *Benfield,* 249 Ill. 139; *Decker* v. *Stansberry,* id. 487.) Section 50 of the Chancery act provides that the court may hear and determine bills to quiet title and to remove clouds from the title to real estate and bills to establish and confirm titles to real estate or incumbrance thereon whether the lands in controversy are improved or occupied or unimproved or unoccupied, and on a bill to quiet title the defense that complainant was out of possession, and hence had a complete remedy at law, comes too late when first set up in this court. (*Stout* v. *Cook,* 41 Ill. 447.) In these cases there were equitable grounds for relief, and the fact that the same evidence might be available in an action at law did not prevent the court of equity taking jurisdiction. There was no allegation in either bill as to possession and no evidence on the subject, but if, as a matter of fact, the complainants are out of possession and might have had an adequate remedy at law the objection comes too late.

Prior to October, 1913, when he suffered a stroke of paralysis, Andrew J. Smith had been a man of more than average intelligence, of good education and good business qualifications and had been a school teacher in his earlier life. By the stroke of paralysis his right side was rendered helpless, and from that time he could not read or write and could not speak beyond yes or no and generally answered by a nod or a shake of his head. His doctor

took him to Chicago for an examination by an expert and the examination took place on December 3, 1913. It was found that he had softening of the brain and was unable to talk, read or write or to understand written or spoken language. The expert tested his capacity in various ways, and he could not distinguish between the most common articles or comprehend the simplest matters. The expert pronounced him a helpless imbecile and gave as an opinion that he would develop convulsions; that the disease was permanent and progressive and that he would never recover. His predictions as to the convulsions proved true, and from that time Smith had convulsions, spasms or fits which would last for five or six hours at a time, during which he was unconscious, and which continued up to the time of his death, and he died in one of them. He never was able to read or write, poured his coffee in his plate and tried to eat it with a fork, picked up an ax and was carrying it in the house and said he was carrying a suitcase in, failed to recognize or remember friends that he had known for years, and forgot that he owned an interest in a store building and lots and could not be made to understand that he owned the interest. He did other things which cannot be stated here which indicated a state of imbecility. On January 12, 1914, he executed the deed to his tenant, Clarence Stallings. Stallings went to John V. Musgraves, justice of the peace, and told him that Smith had gotten the notion to make him a deed, and when Musgraves reached the house there were two doctors there and four other men besides Stallings. Smith could not speak, and when he would try to talk would begin to cry and cried a good deal of the time. He did not give any directions to make a deed and it was not read to him. He said nothing about it, except when one doctor would ask him if he wanted to deed the forty he would nod his head and try to say something and begin crying. After the deed was made he was led over to a table and made his mark. After that

one of the men asked him to assign a mortgage for $750 to Stallings. He did not seem to understand what was being said to him but nodded his head and made the mark to the assignment. Someone suggested putting in the deed that Stallings was to take care of Smith the balance of his life, and it was inserted in the deed, and one of the men proposed that Smith should give Stallings power to transact his business for him. He did not want to do that but finally did. There was talk of executing other instruments, but it was suggested that it had better be postponed to another time. There are other facts which relate particularly to that deed, but its validity is not being considered at this time.

On January 31 Smith executed the two deeds to his cousins, Maud Henson and Anna Bell Love. The evening before the deeds were made they went to Musgraves to have him go out and make the deeds, but he made excuses and finally told them that he was as deep into the thing as he wanted to be; that he did not want any trouble or any lawsuit and they had better get Frank Bensing, another justice of the peace, but they said Bensing would not do it. Bensing had been applied to by Anna Bell Love and Stallings to make the deeds and he made various excuses, but, like Musgraves, finally stated the real reason, which was because he was assured that Smith was not capable of transacting the business. I. J. Upton, a justice of the peace, went to Smith's house and drew up the deeds. On that occasion there were two new doctors and the same men who were there on the other occasion. One of the doctors was something of an expert in the matter of similar diseases, and testified that he examined Smith by asking him questions as to what land he owned and how many acres, what relatives he had, and similar questions, and then pronounced him competent to do business and told them to go ahead with the deeds. The testimony of Upton was to the effect that Smith knew what he was doing and could talk and

answer questions. It appeared that he knew the description of his land and the names of the grantees, and he called attention to mistakes in both by pointing and saying, "No! no!" or something like that. He knew enough to understand that he was making deeds but did not know enough to have a reservation of a life estate in the deeds until it was suggested by someone else. Smith manifested a feeling of hostility to the complainants, his brother and sister, but there is no evidence that it existed before his mental disability. One of the men present testified Smith did not read the deeds; that he did not see how a man could be mentally sound in his condition, but he thought Smith understood the particular business of making the deeds but his mind wandered as to other matters. One of the doctors present at one time, who gave testimony tending to show that Smith knew what he was doing, admitted that he had told another party that Smith was crazy as a loon, but he explained that the statement was made when Smith was suffering from the effects of a spasm, and that he had some hard fits and sometimes it took him six hours to recover consciousness. The expert and the justice who drew the deeds were the only witnesses who testified that Smith could talk, and it is evident that the chancellor, who heard the testimony, considered the weight of the evidence against them. Smith had an account at the bank, and after his affliction he was never able to do anything more than to tell the cashier that he wanted some money and how much, and the cashier would make a check and sign Smith's name to it. There was a large number of witnesses on each side testifying to facts and giving opinions as to Smith's mental capacity, and much weight is to be given to the opinion of the chancellor, who heard the evidence. Upon reading it, it appears that his conclusion was fully justified and that Smith was mentally incapable of executing the deeds.

The decrees are affirmed.                    *Decrees affirmed.*